UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEBORAH THOMAS, et al.,

        Plaintiffs,

                                    Case No.  08-11580

vs.

                                    HON.  GEORGE CARAM STEEH

NORTHWEST AIRLINES CORP. and
WAYNE COUNTY AIRPORT AUTHORITY,

        Defendants.
_____/

ORDER RESOLVING REMAINING
DISPUTED ITEMS IN ACTION PLAN [DOC. 27]

On April 14, 2008, plaintiffs filed their complaint alleging various violations of the Air Carrier Access Act ("ACCA"), Titles II and III of the ADA, and the Rehabilitation Act at the Detroit Metropolitan Airport.  The court granted motions filed by defendants Northwest Airlines Corporation (now "Delta") and the Wayne County Airport Authority ("WCAA"), thereby dismissing all claims under the ACCA.  The parties engaged in a facilitation process and have agreed to a settlement ("Action Plan") which resolves approximately 60 items that were in contention.  Three unresolved items require a decision of the court.

Issue one relates to the existence of an accessible path for rental car shuttle pick up/drop off at the pedestrian bridge level of the McNamara Garage ("Garage").  Issue two focuses on emergency egress at the McNamara Terminal ("Terminal").  Issue three involves the gate counters at the McNamara Terminal and North Terminal.

Title II of the ADA applies to the WCAA as a public entity.  The design and construction of facilities in conformity with 28 C.F.R. Part 36, ADA Standards for

Accessible Design (Department of Justice revised July 1, 1994) ("ADAAG") is deemed to be compliance by a public entity with the ADA.  28 C.F.R. § 35.151(c).  The ADAAG is the result of minimum guidelines issued by the Architectural and Transportation Barriers Compliance Board (the "Access Board") which were incorporated by the Department of Justice in the regulations at 28 C.F.R. Part 36.

Plaintiffs contend that Delta, as a private entity, has violated Title III of the ADA. To state a prima facie case under Title III of the ADA, a plaintiff must establish that (1) he has a disability; (2) the place in question is one of public accommodation; and (3) he is being discriminated against by being refused full and equal enjoyment solely because of his disability.  42 U.S.C. § 12182(a).  In order for Delta to be liable for violations under the ADA, the facilities in question must be determined to be places of public accommodation.

The ADA provides an exclusive list of public accommodations.  42 U.S.C. § 12181(7)(G).  This list includes a terminal for "specified public transportation."  42 U.S.C. § 12181(7).  The statute explicitly excludes aircraft from the definitions of "specified public transportation."  42 U.S.C. § 12181(10).  This court previously held that private airport terminals and facilities related to air transportation are not considered places of public accommodation under Title III, and are not proper subjects for a private cause of action.  (September 2, 2008 Order, doc. 16).  Airport terminals and facilities related to air transportation are instead covered by the ACAA.  The ACAA is a pre-ADA disability access statute.

Facilities at the airport that do not provide access to air transportation are places of public accommodations that fall within the requirements of the ADA.  Facilities such

as retail stores and privately owned food service establishments are clearly places of public accommodation. For such facilities, the third prong of the prima facie case is key, i.e., plaintiffs must prove that they were discriminated against by being refused full and equal enjoyment solely because of their disability. Where the disability claim is based on a physical structure, the issue is whether the structure is readily accessible to and usable by individuals with disabilities. 42 U.S.C. § 12183(a)(1). The accessibility standards are incorporated into the ADA's regulations. See 28 C.F.R. § 36.406. These regulations state that the structure must be in conformance with the ADAAG. 28 C.F.R. § 36.406. If there is no ADAAG standard governing what plaintiffs seek, then plaintiffs cannot sustain a claim of discrimination based on the facility.

In order for the court to find in plaintiffs' favor on the three remaining issues, plaintiffs must show (1) that the facility is not one that provides access to air transportation (therefore it is a place of public accommodation), and (2) that their argument as to why the facility is out of compliance with the ADA is based on the ADAAG requirements.

**Issue One: Accessible path of Travel to Pedestrian Bridge from Parking Area**

The McNamara Garage has ten levels. The Garage is connected to the Terminal by a pedestrian bridge on Level 6, the pedestrian bridge level. A central bank of elevators (the "Central Core") transports passengers from each level of the Garage to the pedestrian bridge level. If passengers park at the outer areas of the Garage, they are able to take auxiliary elevators to the passenger bridge level and step onto a moving walkway that transports them to the Central Core.

An issue raised by plaintiffs is that passengers with ambulatory disabilities who

park at the outer areas of the McNamara Garage do not have an accessible path of travel to the Central Core adjacent to the moving walkway.  The Action Plan has addressed this concern by providing that parking for those with disabilities will be clustered in the Central Core area.  "WCAA will move all accessible parking spaces to a central location on each level of the parking garage, immediately adjacent to the elevators and address slope issues.  These elevators are the primary method of transporting customers to the McNamara Terminal's pedestrian bridge, Level 6."  There is no accessible path issue for determination by the court with regard to individuals with disabilities who are parking.

The issue presently before the court is set forth in Section 38 of the Action Plan: ". . . Plaintiffs' concern regarding path of travel to [and from] the rental car shuttles on Level 4 . . . ."

Level 4 of the Garage contains an area where shuttles pick up and drop off passengers who utilize rental cars.  Passengers may access the elevators in the Central Core and take them up to Level 6 in order to take the pedestrian walkway to the Terminal.  The specific issue raised by plaintiffs relates to an "auxiliary" elevator located at the mid-way point in the shuttle area.  Looking at the diagram provided, from left to right, there is the passenger drop-off for Enterprise, Budget and Dollar/Thrifty, then the auxiliary elevator, then the drop-off for National/Alamo, Hertz, Avis, and the entrance to the Central Core escalators and elevators.  The distance from the auxiliary elevator to the Central Core is 200 feet.  Ambulatory passengers have the choice of walking along Level 4 to the Central Core elevators and escalators, or taking the auxiliary elevator on Level 4 to Level 6, which provides a moving walkway to traverse the 200 feet to the

4

Central Core on that level.  In contrast, a person with an ambulatory disability must use the Central Core elevators on Level 4 because the auxiliary elevator is not an option due to the fact that there is not a stationary walkway coincident with the moving walkway on Level 6.  Plaintiffs explain that the moving walkway is unavailable to the disabled because, in attempting to enter the walkway with a wheelchair, individuals run a risk of being thrown over by the speed of the moving walkway as it comes into contact with the chair.

The parties agree that the path of travel on Level 4 is accessible and complies with the ADA Standards for Accessible Design ("ADAAG").  Plaintiffs contend that the auxiliary elevator violates ADAAG by opening to the moving walkway on Level 6.  According to plaintiffs, passenger elevators are required to be on an accessible path of travel so people with disabilities know which way they can go, and that the path to and from the passenger elevator will be accessible.  It is also imperative that the path beyond the passenger elevator connects with other accessible elements (level surface, ramp, other elevator, etc.).

The relevant provisions of the ADAAG provide:

§ 4.1.2 Accessible Sites and Exterior Facilities: New Construction.  An accessible site shall meet the following minimum requirements: (1) At least one accessible route complying with 4.3 shall be provided within the boundary of the site from public transportation stops, accessible parking spaces, passenger loading zones if provided, and public streets or sidewalks, to an accessible building entrance.  (2) At least one accessible route complying with 4.3 shall connect accessible buildings, accessible facilities, accessible elements, and accessible spaces that are on the same site.

4.3.2 Location.  (1) At least one accessible route within the boundary of the site shall be provided from public transportation stops, accessible parking, and accessible passenger loading zones, and public streets or

sidewalks to the accessible building entrance they serve. The accessible route shall, to the maximum extent feasible, coincide with the route for the general public.

4.10 Elevators.

4.10.1 General. Accessible elevators shall be on an accessible route and shall comply with 4.10 and with the ASME 17.1-1990 Safety Code for Elevators and Escalators

Defendants argue that only 4.1.2(1) applies to the auxiliary elevator, because subsection (1) specifically refers to accessible paths for "public transportation stops" and "passenger loading zones". Section 4.1.2(1) requires at least one accessible route from the passenger loading zone to the accessible building entrance, which exists here at the Central Core.

Section 4.1.2 begins with the language: "An accessible site shall meet the following minimum requirements", and proceeds to describes two categories where at least one accessible route must be provided. The section is written in terms of minimum requirements such that if both subsections are applicable to a specific accessible site, then both requirements must be met. The court must give effect to the intent of the Legislature in interpreting the language of the statute. Here, the language is clear and unambiguous, so judicial construction is neither required nor permitted. Turner v. Auto Club Ins. Ass'n, 448 Mich. 22, 27 (1995). In addition to existing in a passenger loading zone for purposes of complying with § 4.1.2(1), the auxiliary elevator is an accessible element for purposes of § 4.1.2(2) because it is on an accessible path of travel on Level 4. Therefore, § 4.1.2(2) must also be met, and requires that at least one accessible route complying with § 4.3 shall connect the auxiliary elevator (an accessible element) with the pedestrian walkway on Level 6 (another accessible

element).

At the hearing, the court inquired whether immobilizing the moving walkway would accommodate people with ambulatory disabilities. Plaintiffs' counsel stated that they would need to look into the issue. While the court recognizes that an interior walkway adjacent to the moving walkway would be the best solution, immobilizing or removing the moving sidewalk on Level 6 is a reasonable, and minimally disruptive, solution under the circumstances.

The court is confident the parties will work together to determine whether immobilizing the walkway will provide a safe path of travel for ambulatory disabled persons, or whether removing the walkways will be required. Of course, if immobilizing the walkways is determined not to be a safe alternative, defendants have the option of providing an interior walkway adjacent to the moving walkway in order to maintain the moving walkway for ambulatory passengers and their luggage.

**Issue Two: Emergency Egress from McNamara Terminal**

The Terminal is a multi-story facility and use of the elevators is not an option in an emergency. The Terminal has over forty emergency egress exits which permit ambulatory users to evacuate via stairs from the departure level of the Terminal to ground level, which is the tarmac. None of the existing emergency egress staired exits are accessible to a person who requires an accessible path of travel. Instead, passengers with ambulatory disabilities are to assemble at the landings of the emergency exit stairwells where first responders will assist them.

The ADAAG standard on emergency egress is in section 4.1.3:

(9) In buildings or facilities, or portions of buildings or facilities, required to

> be accessible, accessible means of egress shall be provided in the same number as required for exits by local building/life safety regulations. Where a required exit from an occupiable level above or below a level of accessible exit discharge is not accessible, an area of rescue assistance shall be provided on each such level (in a number equal to that of inaccessible required exits). Areas of rescue assistance shall comply with 4.3.11.
>
> EXCEPTION: Areas of rescue assistance are not required in buildings or facilities having a supervised automatic sprinkler system.

Areas of rescue assistance can be stairwell landings of at least 30 inches by 48 inches within a smokeproof enclosure, with a stairway width of 48 inches, a two way communication system and appropriate signage. ADAAG 4.3.11.

The Terminal has a supervised automatic sprinkler system. Defendants argue that under the clear exception in 4.1.3(9), areas of rescue assistance are not required in the Terminal. Defendants explain that passengers with disabilities exit the Terminal with the assistance of first responders. While the WCAA is not required to have an area of rescue assistance under the ADAAG, the ADAAG recognizes that a temporary haven is an appropriate evacuation. The term "Area of Rescue Assistance" is defined at ADAAG 3.5 as an area "where people who are unable to use stairs may remain temporarily in safety to await further instructions or assistance during emergency evacuation." Defendants argue that the emergency egress at the Terminal complies with ADAAG in letter and spirit.

Clearly the ADAAG addresses the dangers posed by a fire and does not contemplate a terror attack. An area of rescue assistance, as conceived by the ADAAG, will not be sufficient to assure the safety of physically disabled passengers in all types of emergency situations. While plaintiffs argue that the lack of accessible

8

egress from the Terminal violates the Americans with Disabilities Act, compliance with the ADAAG is deemed to be compliance with the ADA as to defendant WCAA. 28 CFR 35.151(c). Furthermore, if there is no ADAAG standard governing what plaintiffs seek, then plaintiffs cannot sustain a claim of discrimination against Delta based on the facility. See e.g., Commonwealth of Mass. v. E*Trade Access, Inc., Case No. 03-CV-11206-MEL, 2005 U.S. Dist. LEXIS 22621, at *10 (D. Mass., Feb. 22, 2005) ("The statutory language and structure of the ADA indicate that Congress intended that the DOJ's regulations and the ADAAG, when passed, would set forth the standards sufficient to satisfy the ADA obligations . . . Accordingly, the remedy of voice-guidance technology, which is not mandated or required by the current DOJ regulations may not be imposed on the Defendants in this case . . . and the DOJ's policymaking authority may not be compromised or preempted by the Court."). The emergency egress/refuge at the McNamara Terminal complies with the ADAAG, and therefore the ADA.

The court and counsel for the parties discussed the practical safety concerns in this age of terror threats in air travel. Defendants recognize the challenge of providing disabled persons an evacuation plan in the case of a dirty bomb, shooter, or chemical or biological terror in the Terminal. Defendants indicated that discussions are ongoing regarding an emergency plan at the Terminal. The court urges defendants to continue those discussions, and to focus on the topic of providing assistance to ambulatory disabled passengers in circumstances requiring evacuation of the Terminal.

**Issue Three: Gate-Counter Height**

There are 159 gate-counters in the McNamara and North Terminals, each having two surfaces - a main counter approximately 47 ¾ inches high and an auxiliary counter

approximately 31 ¾ inches high. While the ticketing counters at the forefront of the Terminals are the principal sites for the purchase of tickets, some ticketing functions do occur at the gate-counters. Plaintiffs' argument is that, as ticketing areas, the gate-counters are required to comply with the ADAAG, which requires that the entire surface of the counter be 36 inches or less in height. ADAAG 7.2.

Defendants contend that gate-counters are facilities that provide access to air transportation, therefore they are within the purview of the ACAA, not the ADA. The preamble to the current ACAA regulations states: "The ACAA and Department of Transportation's ACAA regulations apply to terminal facilities owned, leased, or controlled by a carrier, specifically facilities that provide access to air transportation (e.g., ticket counters, baggage claim areas, gates)." *ACAA Regulations Preamble*. Delta's Regional Director of Properties, Marcus Kemper, explains that the purpose of a gate-counter is to provide access to the aircraft. Passengers may not board a plane without first presenting their ticket at the gate-counter. (Kemper Decl. ¶4).

The gate-counter is the gateway from the Terminal to the aircraft itself. The gate-counter serves multiple functions, including that of ticket counter, although passengers may not conduct business at the gate-counter unless they already have a ticket. However, the primary function of the gate-counter is to assist passengers in boarding the aircraft. The fact that the gate-counter provides some of the same services as a ticket counter does not alter its status as a facility that provides access to air transportation, and therefore comes under the purview of the ACAA.

As this court previously held, the ACAA does not provide plaintiffs with a private cause of action. (Opinion and Order, September 2, 2008, doc. # 16). Therefore,

plaintiffs have no cause of action as to the accessibility of the gate-counters.

In conference with counsel, there was a discussion regarding minor alterations to the gate-counters which would better accommodate passengers in wheelchairs. The court hopes that its holding does not keep defendants from investigating reasonable accommodations which could be provided to this particular population whose travel plans take them through the McNamara or NorthTerminals.

**Conclusion**

The court commends counsel for diligently working together in this case to come up with solutions that are practical and in the best interest of the plaintiffs. As for the three remaining disputed issues in the Action Plan, the court holds as follows:

- Defendants are in violation of the ADA for not providing an accessible path of travel from the auxiliary elevator discharge area to the pedestrian bridge area on Level 6. Defendants are required to provide an accessible route in lieu of, or adjacent to, at defendants' choosing, the moving walkways on Level 6, that will result in a coincident path of travel from the elevator discharge area to the pedestrian bridge.
- Defendants are not in violation of the ADA on the issue of emergency egress from the McNamara Terminal.
- Plaintiffs lack a private cause of action regarding the height of the gate-counters, which are facilities that provide access to air transportation, and therefore are within the purview of the ACAA.

11

So ordered.

Dated: August 16, 2011

S/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on August 16, 2011, by electronic and/or ordinary mail.

S/Josephine Chaffee
Deputy Clerk

---